1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TERESA ZAZENSKI, | ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: C 12-2344 PSG |
| Plaintiff, | **ORDER REASSIGNING CASE TO A U.S. DISTRICT JUDGE; REPORT & RECOMMENDATION** |
| v. | |
| JILLIAN DANNER AND THE SOCIAL VISTA, LLC., | **(Re: Docket No. 27)** |
| Defendants. | |

Plaintiff Teresa Zazenski ("Zazenski") filed suit against her former employer, Jillian Danner ("Danner") and The Social Vista, LLC ("TSV") (collectively, "Defendants"). Although Zazenski has consented to proceed before the undersigned,[1] Defendants have not appeared and therefore have not filed any consent. Zazenski now moves for entry of default judgment against Defendants.

---

[1] *See* Docket No. 5.

1

Case No.: 12-2344 PSG
ORDER

United States District Court
For the Northern District of California

IT IS HEREBY ORDERED that the case be reassigned to a district judge with the recommendation that the motion for default judgment be granted with the amount of damages to be determined at a hearing.[2]

## I.   BACKGROUND[3]

Zazenski and Danner first met around March 2009 while both were living in Hattiesburg, Mississippi.  The two became friends and the friendship continued after Zazenski and her husband moved to Morgan Hill, California in early 2011.  In March 2011, Danner contacted Zazenski in California to recruit her to work for TSV, a Mississippi social media company.  Danner represented that TSV was opening a California office and offered Zazenski the position of Chief Operating Officer ("COO"), promising her a salary of $50,000 per year through November 2011, increasing to $75,000 thereafter.[4]  Danner assured Zazenski that TSV was well-capitalized.

At the time, Zazenski was working for her father's company, earning $30 per hour plus commission and benefits.  Excited by the prospect of fulfilling her dream of owning and operating her own company, Zazenski accepted the offer on March 31, 2011 and quit her job at her father's company.[5]  In her role as COO of TSV, Zazenski was involved in every operational aspect of TSV, including managing its employees, and she devoted significant time and attention to marketing and ensuring TSV client satisfaction.

---

[2] The undersigned is ordering reassignment to a district judge and issuing a report and recommendation because, absent consent of all parties, a magistrate judge does not have the authority to make case-dispositive rulings. *See* 28 U.S.C. §636(c); *Tripati v. Rison,* 847 F.2d 548, 548-49 (9th Cir. 1988).

[3] Unless otherwise noted, the facts are taken from the complaint.  *See* Docket No. 1.

[4] Danner sent Zazenski an employment contract on August 14, 2011 memorializing these terms. *See id.* Although Zazenski returned a redline version to her on August 28, 2011, the contract was never formally executed.

[5] *See, e.g.,* Docket No. 1, Ex. B.  Although Zazenski asserts that she started working for TSV in March, 2011, the facts on the whole indicate that she actually started working in sometime between June and August.  The out of pocket expenditures began in August and that's when Danner started lying about being sick.  August is also the month when Danner and Zazenski traded redline edits of Zazenski's employment contract.

Case No.: 12-2344 PSG
ORDER

**United States District Court**
For the Northern District of California

On April 6, 2011, Danner told Zazenski that she was not well and that her accountant, Matt Roeder ("Roeder"), would be in touch to make sure Zazenski had full legal control of TSV in the event of a medical emergency.[6]  According to Roeder, his services were never retained by TSV or by Danner.[7]  That same month, Danner told Zazenski that she was giving her shares of TSV because it "was the right thing to do."[8]

Beginning in August 2011, Danner told Zazenski on several occasions that she was undergoing various medical procedures and urged Zazenski to take control of TSV.[9]  On or around September 27, 2011, Danner suggested that she would give Zazenski a 35% ownership interest in TSV but that she had to first consult with her lawyer.  With Danner's promise of an ownership interest in TSV, Zazenski was not overly concerned that she had yet to receive even a single paycheck.[10]

In October 2011, Danner claimed she had cancer and delegated all of her responsibilities at TSV to Zazenski.[11]  Shortly thereafter, TSV employees began asking Zazenski for their paychecks. Danner claimed that there had been some accounting mistake and Roeder was being terminated. She asked Zazenski to pay their salaries in the meantime.  Zazenski agreed, and paid $8,800 in employee salaries.

During this time, Zazenski and her husband were looking to buy a new home.   Having yet to receive a paycheck or proof of employment, Zazenski asked Danner for back pay and proof of employment so she could get approved for a home loan.  Danner agreed.  However, every time

---

[6]  See Docket No. 27-1.

[7]  *See id.*

[8]  *See id.*

[9]  *See id.*

[10]  *See id.*

[11]  *See id.*

Case No.: 12-2344 PSG
ORDER

Zazenski inquired about her back pay, Danner claimed some error with her bank or other excuse. In November 2011, Zazenski found a home she wished to purchase and her parents put in a cash offer of $510,000 on her behalf, made on the understanding that she would soon receive proof of employment and could soon secure a mortgage.  On November 9, 2011, Zazenski had her bank mail Danner deposit slips so Danner could pay her.  Although Danner said she sent the payments, they were never received by the bank.  Prior to the close of escrow, Zazenski asked Danner if there was any reason to put off the closing, or to avoid purchasing the home.  Danner responded in the negative and told Zazenski to go ahead with closing.  On November 17, 2011, escrow closed with the final purchase price at $514,158.  Zazenski and her parents agreed that her parents would complete the purchase in cash and Zazenski would pay them back with 5% interest as soon as she could secure a mortgage.

On December 3, 2011, Zazenski requested Danner reimburse her for a list of expenses incurred on behalf of TSV, totalling $9,296.43.[12]  Danner acknowledged the debt and again promised that a reimbursement check was forthcoming.  Zazenski again never received a check.

In January 2012, Danner claimed to be in a Hattiesburg hospital for surgery.  When a TSV employee tried to send Danner flowers, the employee learned that Danner was not, in fact, admitted to either of the two hospitals in Hattiesburg.

Around March 13, 2012, after continued requests for back pay, reimbursements, and proof of employment, Danner promised Zazenski that she was sending out her W-2, paystubs, and a check for back pay via FedEx.  When the package arrived, Zazenski found only a "Healthy Cells" magazine inside.  Danner claimed she accidentally sent Zazenski the wrong FedEx package.

Later that month, Danner told Zazenski that she could have a 35% interest in TSV if she brought in five clients.  That same month, Danner told Zazenski that she had sold TSV, but assured

---

[12]  *See*, *e.g.,* Docket No. 1, Ex. C.

4

Case No.: 12-2344 PSG
ORDER

Zazennski there would be a position for her with the new owners.  In April 2012, Zazenski finally received a W-2, but it contained false employer identification numbers and claimed federal and state wages and withholdings that were never paid.[13]  Later that month, Danner told other TSV employees that TSV had been sold and all employees were going to be terminated.[14]

On May 9, 2012, Zazenski filed this suit against Danner and TSV alleging: (1) fraud and deceit; (2) negligent misrepresentation; (3) breach of contract; (4) unjust enrichment; (5) breach of implied contract; (6) promissory estoppel; (7) money had and received; (8) goods and services rendered; and (9) unfair business practices.

On May 11, 2012, Zazenski's counsel sent Danner a notice and request for waiver of service of process including all required documents pursuant to Fed. R. Civ. P. 4(d).[15]  Defendants never returned the waiver.[16]  Zazenski served both TSV and Danner, but neither party responded.[17]  The Clerk entered default pursuant to Fed. R. Civ. P. 55(a) against both Danner and TSV on July 10, 2012 and July 27, 2012, respectively.[18]

The court denied Zazenski's request for leave to file excess pages on March 14, 2012.[19]  On April 1, 2013, Zazenski filed this motion for entry default judgment,[20] and appended a number of declarations, including Zazenski's own 23 page declaration with exhibits totaling 161 pages.[21]

---

[13]   Zazenski was not the only TSV employee to receive fraudulent tax documents – one employee is currently under investigation for filing a false W-2.  *See* Docket No. 27-8.

[14]   According to Zazenski, TSV's non-centralized location was a big factor in enabling Danner's fraud to continue for so long.  All employees worked remotely which helped obfuscate communication between employees.

[15]   *See* Docket No. 27-6 ¶ 3.

[16]   *See id.*

[17]   *See* Docket Nos. 6, 7.

[18]   *See* Docket Nos. 12, 15.

[19]   *See* Docket No. 26.

[20]   *See* Docket No. 27.

Case No.: 12-2344 PSG
ORDER

## II.    LEGAL STANDARDS

When a party against whom a judgment for affirmative relief is sought "has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise," the court may enter default judgment.[22]   The court has "broad latitude to impose the sanction of default" at any point to ensure the "orderly and expeditious conduct of litigation."[23]

"The district court's decision whether to enter a default judgment is a discretionary one."[24] In the Ninth Circuit, district courts weigh the *Eitel* factors in making this determination: (1) the substantive merits of plaintiff's claim; (2) the sufficiency of the complaint; (3) the amount of money at stake in relation to the seriousness of Defendants conduct; (4) the possibility of prejudice to plaintiff if relief is denied; (5) the possibility of dispute as to any material facts in the case; (6) whether default resulted from excusable neglect; and (7) the strong policy of the Federal Rules of Civil Procedure favoring decisions on the merits.[25]

In considering a motion for default judgment, the court need not accept the amount of damages plead in the complaint.  The damages, however, may not differ greatly from those alleged.[26]  "[The] [p]laintiff is required to prove all damages sought in the complaint."[27]   When entering a default judgment, a court must hold a hearing unless the amount claimed is a liquidated

---

[21]  *See* Docket No. 27-1.

[22]  Fed. R. Civ. P. 55(a).

[23]  *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141 (9th Cir. 1989) (imposing default judgment after defendant failed to attend pretrial conferences and otherwise communicate with the plaintiff and the court).

[24]  *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir.1980).

[25]  *See Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

[26]  *See id.* (*citing* Fed. R. Civ. P. 55(b)(2)).

[27]  *Philip Morris USA, Inc. v. Castworld Products, Inc.*, 219 F.R.D. 494, 498 (C.D. Cal. 2003).

Case No.: 12-2344 PSG
ORDER

1   sum or capable of mathematical calculation.[28]   The court may, however, base its award on

2   declarations submitted by the plaintiff.[29]

3                        **III.      DISCUSSION**

4   **A.      Default Judgment**

5           **1.      Substantive Merits and the Sufficiency of the Complaint**

6           The first two *Eitel* factors, the substantive merits of plaintiff's claim and the sufficiency of

7   the complaint, require that plaintiff's allegations "state a claim on which the [plaintiff] may

8   recover."[30]   "[T]he general rule of law is that upon default the factual allegations of the complaint,

9   except those relating to the amount of damages, will be taken as true."[31]

10          Plaintiffs nine causes of action sound essentially in contract and fraud.  The court first

11  surveys Zazenski's breach of contract claim.  A claim for breach of contract requires establishment

12  of four elements: existence of a contract, performance by the complaining party, breach by the

13  opposing party and damages.[32]   The employment contract between Zazenski and Danner required

14  Danner to pay Zazenski for her services and reimburse her for necessary expenses incurred in

15  discharge of her duties.[33]   Zazenski appears to have performed her job duties for about a year.  She

16  also alleges that Danner asked her to pay certain TSV costs out of pocket, including paying TSV

17  employee salaries, and promised to repay her.  Defendants never paid her, despite repeated

---

[28] *See Davis v. Fendler,* 650 F.2d 1154, 1161 (9th Cir. 1981); *James v. Frame,* 6 F.3d 307, 310 (5th Cir. 1989).

[29] *See id.*

[30] *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978).

[31] *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977).

[32] *See, e.g., Sonic Mfg. Techs., Inc. v. AAE Sys., Inc.*, 196 Cal. App. 4th 456, 464 (2011).

[33] *See Stuart v. RadioShack Corp.,* 641 F. Supp. 2d 901, 902 (N.D. Cal. 2009) (citing California Labor Code § 2802, which provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties").

Case No.: 12-2344 PSG
ORDER

United States District Court
For the Northern District of California

demands for both compensation and reimbursement, causing Zazenski to suffer damages.  Given this information, Zazenski has sufficiently pleaded facts showing Defendants breached their employment contract.

Turning to Zazenski's fraud claim, under California law, a plaintiff must allege "(1) a knowingly false representation by the defendant; (2) an intent to defraud or to induce reliance; (3) justifiable reliance, and (4) resulting damages." [34]  Fed. R. Civ. P. 9(b) additionally requires plaintiffs to plead fraud with particularity.[35]  As interpreted by the Ninth Circuit, this requires specificity in the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.[36]  Zazenski alleges that Defendants fraudulently misrepresented a number of material facts, including that TSV would pay Zazenski a salary even though Danner had no intention of doing so.[37]  Judging from Danner's actions and false statements, it can be reasonably inferred that Danner knew her statements were false and made them with an intent to defraud Zazenski.[38]  On several occasions, Zazenski sought Danner's reassurance that Zazenski would get paid and reimbursed for expenses, justifying Zazenski's reliance.  Zazenski did rely on such promises, left her job, and began working for Danner and TSV for about a year, and as a result suffered lost wages and expenses.  Plaintiff's complaint thus states a claim for breach of contract and fraud upon which she may recover, satisfying the first two *Eitel* factors.[39]

---

[34] *Croeni v. Goldstein,* 26 Cal. Rptr. 2d 412, (1994); *Cicone v. URS Corp.,* 183 Cal. App. 3d 194, 200 (1986); *see also* Cal. Civ. Code § 1709.

[35] Fed. R. Civ. P. 9(b).

[36] *Neubronner v. Milken,* 6 F.3d 666, 671-72 (9th Cir. 1993).

[37] *See* Docket No. 1.

[38] *See id.*; *see also* Docket No. 27-1.

[39] Where, as here, the plaintiff's claim sounds in both contract and tort, the plaintiff must ultimately elect between the two inconsistent remedies.  The plaintiff cannot recover for both, but may recover under whichever theory yields greater damages.  *See Roam v. Koop*, 41 Cal. App. 3d 1035, 1039 (1974).

Case No.: 12-2344 PSG
ORDER

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.    Possibility of Dispute of Material Facts

Another *Eitel* factor involves the possibility of dispute as to any material facts in the case. While Defendants might have disputed facts in this case had they appeared, the reality is Defendants failed to do so and have waived their opportunity to dispute these facts.  Courts take this into account and hold that when the Clerk has entered default, all well-pleaded factual allegations set forth in the complaint will be taken as true, except for those allegations pertaining to damages.[40]

### 3.    Amount of Money at Stake

The third *Eitel* factor requires the court to consider the amount of money involved in relation to the seriousness of the defendant's conduct.[41]  Here, Defendants repeatedly and intentionally lied to Zazenski in order to induce her to work hundreds of hours with no compensation.  Zazenski seeks an entry of default judgment in the amount of $191,466.05 plus a 1.3 times multiplier as punitive damages, bringing the total damages to $440,371.92 which is reasonable in relation to the seriousness of Defendants' conduct.  This *Eitel* factor weighs in favor of default judgment.

### 4.    Excusable Neglect

The court next considers whether Defendants' failure to appear was due to excusable neglect.  Where the defendant has been properly served or the plaintiff otherwise demonstrates the defendant was clearly aware of the pending litigation, excusable neglect is remote and this factor weighs in favor of default judgment.[42]  Here, Zazenski effected personal service on Danner and she

---

[40]  *See Televideo v. Heidenthal,* 826 F.2d 915, 917-18 (9th Cir. 1987).  *See also PepsiCo, Inc.*, 238 F. Supp. 2d at 1177.

[41]  *See Kloepping v. Fireman's Fund*, Case No. 94-2684 TEH, 1996 WL 75314, at *4 (N.D. Cal. Feb. 13, 1996).

[42]  *See id.*

Case No.: 12-2344 PSG
ORDER

still never appeared in court.[43]  The possibility of excusable neglect is therefore remote and this factor weighs in favor of default.

### 5.    Policy for Deciding on the Merits and Possibility of Prejudice

The strong preference of the Federal Rules of Civil Procedure to have courts render decisions on the merits is problematic in a case such as this in which the defendants have not even responded to the plaintiff's complaint.  While the Federal Rules favor decisions on the merits, this preference standing alone is not dispositive.[44]  Such a decision is not possible where the defendants have refused to participate in the proceedings.[45]  Thus, the preference to decide cases on the merits does not preclude granting default judgment.

The potential prejudice to Zazenski also weighs in favor of granting default judgment.  This may be Zazenski's only opportunity to recover the damages she suffered due to Defendants' actions.  If the court were to deny this motion, and Zazenski were forced to first locate and track Defendants before adjudicating the dispute, at least some of Zazenski's claims may later be precluded on the basis of the statute of limitations.

In sum, consideration of the *Eitel* factors weighs in favor of entering default judgment against Defendants and in favor of Zazenski.

## B.    Damages

After determining liability, the court then calculates the amount of damages that should be awarded.[46]  This two-step process is proper because while for purposes of default judgment the court generally accepts as true the factual allegations of the complaint, the court need not do so

---

[43] *See* Docket No. 1.

[44] *See Kloepping*, 1996 WL 75314, at *3.

[45] *See PepsiCo, Inc.*, 238 F. Supp. 2d 1172, 1177 (2002).

[46] *Wecosign, Inc. v. IFG Holdings, Inc.,* 845 F. Supp. 2d 1072, 1078 (C.D. Cal. 2012).

Case No.: 12-2344 PSG
ORDER

10

United States District Court
For the Northern District of California

regarding damages.[47]  Zazenski seeks an entry of default judgment in actual damages amounting to $191,466.05, plus a 1.3 times multiplier as punitive damages, bringing the total to $440,371.92. The actual damages amount includes unpaid wages, reimbursements for out-of-pocket expenditures, lost future income, consequential damages, and emotional distress damages. Zazenski additionally requests pre- and post-judgment interest and costs of bringing suit.

As discussed previously, Zazenski has established that default judgment is warranted on both her contract and tort theories, but cannot recover damages under both. [48]  In an action involving a contract obtained through fraud, the injured party can choose to either sue under the contract, or affirm the contract and sue for damages based on the fraud.[49]  Zazenski may choose to recover under tort law, which would enable her to obtain emotional distress and punitive damages that are not available under contract law.[50]

Several problems arise in calculating Zazenski's damages.  The Ninth Circuit is clear that unless the damages are liquidated or in a sum susceptible to mathematical calculation, a hearing must be conducted on the issue of damages.[51]  Even if Zazenski's affidavits could replace such a hearing, the facts presented in those affidavits are insufficient to determine several categories of Zazenski's damages.[52]  First, regarding her back pay, it is unclear from the affidavits provided

---

[47] *See id.*

[48] *See Roam*, 41 Cal. App. 3d at 1039.

[49]  *See Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (1996); *Jue v. Smiser,* 23 Cal. App. 4th 312, 315 (1994).

[50] *See Channell v. Anthony,* 58 Cal. App. 3d 290, 320 (1976); Sprague v. Frank J. Sanders Lincoln Mercury, Inc., 120 Cal. App.3d 412, 417 (1981).

[51] *See Davis,* 650 F.2d at 1161 ("It is well settled that a default judgment for money may not be entered without a hearing unless the amount claimed is a liquidated sum or capable of mathematical calculation").

[52] Other courts have held that detailed, sworn affidavits are sufficient.  *See, e.g., Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991); *Wecosign, Inc. v. IFG Holdings, Inc.,*

Case No.: 12-2344 PSG
ORDER

when she began working for Defendants and when she concluded her work.  Without that information, the court cannot compute the exact amount of past wages she is owed.  Second, her claims for punitive damages are also not calculable on the facts presented.  Punitive damages must be "reasonably related" to the amount of compensatory damages, which cannot be determined at this time.[53]  A punitive damages award depends in part on the severity of the harm suffered by the plaintiff and the amount that would deter the defendant from similar tortious conduct in the future.[54]  While Zazenski has established some facts showing Defendants' ill will, she has not provided sufficient evidence to show what would deter Defendants from engaging in similar tortious conduct and Defendants' financial status.  Third, Zazenski's lost future income claim, recoverable under California law,[55] and damages arising from her home loan interest payments, also cannot be determined because it is unclear whether Danner's actions were the proximate cause of these harms.

## IV.    CONCLUSION

The court issues this report and recommendation that the default judgment be granted, with the amount of damages to be determined at a hearing.

IT IS SO ORDERED.

Dated:  July 31, 2013

_Paul S. Grewal_
_____
PAUL S. GREWAL
United States Magistrate Judge

---

845 F. Supp. 2d 1072, 1078 (C.D. Cal. 2012); *see also* Fed. R. Civ. P. 55(b)(2) ("The court *may* conduct hearings or make referrals") (emphasis added).

[53] *Liodas v. Sahadi,* 19 Cal. 3d 278, 284 (1977).

[54] *See College Hosp., Inc. v. Superior Court,* 8 Cal. 4th 704, 712 (1994).

[55] *See, e.g., Helmer,* 129 Cal. App. 4th at 1125.

12

Case No.: 12-2344 PSG
ORDER